# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
Case No.

| | |
|---|---|
| MARK SHAFFER,<br><br>     Plaintiff,<br><br> v.<br><br><br>WELLA INTERNATIONAL OPERATIONS SWITZERLAND S.À.R.L.; WELLA OPERATIONS US LLC d/b/a THE WELLA COMPANY; L'ORÉAL USA, INC.; L'ORÉAL USA PRODUCTS, INC.; and L'ORÉAL S.A.,<br><br>     Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1. Plaintiff Mark Shaffer (Mr. Shaffer) brings this action against Defendants Wella International Operations Switzerland S.À.R.L.; and Wella Operations US LLC d/b/a The Wella Company (collectively, "Wella"), L'Oréal USA, Inc., L'Oréal USA Products, Inc., and L'Oréal S.A. (collectively, "L'Oréal") (and altogether, "Defendants"). He asserts claims for negligence, failure to warn, fraud, and other state and federal causes of action against the Defendants based on the dangerous design and defective manufacturing of their professional hair dye products, as well as their failure to warn him—a professional hair stylist—of the increased risk of bladder cancer caused by long-term exposure to Defendants' products. In support of Plaintiff's claims, Plaintiff states as follows:

## II.   PARTIES

2.     Plaintiff Mark Shaffer ("Plaintiff") or ("Mr. Shaffer") is, and at all times relevant to this action was, a citizen and resident of the State of North Carolina.

3.     Wella International Operations Switzerland S.à.r.l. ("Wella International") is a *Société à Responsabilité Limitée* headquartered in Geneva, Switzerland.  Wella maintains two American offices—one in New York, New York, and another in Calabasas, California—and is the parent company of Wella Operations US LLC d/b/a the Wella Company.

4.     Wella Operations US LLC d/b/a the Wella Company is a Delaware limited liability company with its principal place of business and headquarters located at 4500 Park Granada, Suite 100, Calabasas, California 91302.  It is a subsidiary of Wella International.

5.     L'Oréal USA, Inc., is a Delaware corporation with its headquarters and principal place of business located at 575 Fifth Avenue, New York, New York 10017.  L'Oréal USA, Inc., is a subsidiary of L'Oréal S.A.

6.     L'Oréal USA Products, Inc., is a Delaware corporation with its headquarters and principal place of business located at 10 Hudson Yards 347, 10th Avenue, New York, New York 10001.

7.     Defendant L'Oréal S.A. is a *Société Anonyme*, with its principal place of business and headquarters located at 41 Rue Martre, 92117 Clichy, Hauts-de-Seine, France.

8.     Defendant L'Oréal S.A. is liable to Plaintiff under the facts alleged in this complaint by virtue of its own acts and omissions, as well for the acts and omissions of its agents, joint venturers, and alter ego subsidiaries, Defendants L'Oréal USA, Inc., and L'Oréal USA Products, Inc.

## III.   JURISDICTION AND VENUE

9.    This Court has subject-matter jurisdiction over this litigation under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and Plaintiff and Defendants are citizens of different states.

10.    This Court has personal jurisdiction over the Defendants in accordance with the allegations asserted here, as Defendants personally availed themselves to jurisdiction in North Carolina by marketing, advertising, and selling their products to licensed cosmetologists in North Carolina.  Defendants have sufficient minimum contacts with this North Carolina through their commercial activities to render the exercise of jurisdiction by this Court allowable.

11.    Venue is proper in this Court pursuant to 18 U.S.C. 1391(b) because a substantial part of the events or omissions giving rise to this litigation occurred in the Western District of North Carolina.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.    As a licensed cosmetologist, Mr. Shaffer was exposed to Defendants' carcinogenic hair dyes daily for 30 years.

12.    Mr. Shaffer became a licensed cosmetologist in Virginia in 1994. After starting his career in Virginia and spending a couple of years in New York City, he relocated to Greensboro, North Carolina, in 1996. Mr. Shaffer practiced as a licensed cosmetologist in Greensboro from 1996–2023, before moving to Ashville, North Carolina.

13.    A core part of Mr. Shaffer's business, as a professional hair stylist, was providing hair coloring services for his clients.  Throughout his career, he devoted a significant portion of his professional time to mixing, preparing, and applying hair dye products during the course of those services.

14. Mr. Shaffer's professional application method consisted of applying the hair dye by hand while wearing protective gloves and allowing the product to remain on the client's hair for the manufacturer-recommended processing time so that the dye could fully penetrate and color the hair in accordance with the manufacturer's instructions.

15. After a period of weeks or months, and depending on the hair's natural growth rate, the colored portion of the hair grows away from the scalp as new growth sprouts from the roots. As the hair continues to grow, an obvious contrast emerges between the colored portions and the new hair growth, prompting Mr. Shaffer's clients to color their hair on a routine basis to match the rest of their hair.

16. Mr. Shaffer performed 3–5 applications per day, on average, causing him to be exposed to Defendants' toxic hair dye products on a daily basis, multiple times per day, for twenty-seven years, as he applied the products to his clients' scalp.

**B.     Defendants designed, marketed, and sold their toxic hair dyes even though they knew, or in the exercise of ordinary care, should have known that continuous long-term exposure would significantly increase stylists' risk of cancer.[1]**

17. For decades, Defendants have designed, manufactured, and marketed their hair dye products to customers across the United States and the world. Defendants' marketing schemes heavily leverage branding and slogans that emphasize how dyed hair enhances users' physical beauty, sex appeal, and youthfulness, all while failing to inform consumers, such as plaintiff, of the carcinogenic risks of usage of their hair dyes.

---

[1] The following discussion of various Defendant manufacturers and/or products is not an exhaustive list of all hair dye manufacturers and/or products that have been marketed to professional and retail users, nor is it an exhaustive list of all manufacturers and/or products currently on the market. Rather, it is a representative sample of how each Defendant has marketed their hair dye products throughout the years.

### 1. Wella

18. Wella[2] has long marketed its hair dye products as safe and effective, often emphasizing their commitment to quality and innovation.

19. For example, Wella solidified its grip on the beauty industry with the launch of its *Koleston* hair dye in 1950, which it claims was "the first cream colourant that nourishes the hair."[3]

20. The *Koleston* hair dye became so popular among stylists—reaching 5.5 million tubes sold worldwide in its first three years—that it spawned multiple subsequent derivative hair dye product lines.[4] Wella's initial hair dye success influenced the company to continue their intentional marketing towards stylists by providing "the most up-to-date salon equipment available," and even opening a research lab in 1957 for "developing advanced hair care, colour and styling solutions, driving breakthroughs that shape the professional hairdressing industry."[5]

21. The decades-long success of *Koleston* hair dye products led Wella to relaunch the *Koleston* product line as "*Koleston Perfect*" in 1995, claiming that it had more "natural ingredients like fruit wax" that would better ensure healthy hair.[6]

22. *Koleston Perfect* remains one of Wella's most popular professional hair dye product lines, currently marketed as Wella's "purest permanent hair color and the first and only professional hair color combining uncompromised color

---

[2] "Wella" as used herein, refers to Defendants Wella International Operations Switzerland S.A.R.L., and Wella Operations US LLC d/b/a The Wella Company.
[3] WELLA PROFESSIONALS, *Over 140 Years of Passion: Our History*, https://www.wella.com/professional/en-AU/about-the-brand (last visited May 18, 2026).
[4] *Id.*
[5] *Id.*
[6] *Id.*

performance with Metal Purifier and ME+ Dye Technology for true-to-tone color and protection from damage."[7]

23.   *Koleston* is not Wella's only prominent hair dye though.  Its *Color Touch* product line was launched in 1988 and saw multiple variations across the next several decades including *Color Sensations* in 2002, an advanced hair dye product intended for professional application that allowed for more creative hair colors.[8]

24.   Wella's *Illumina Color* line, launched in 2012, is one of the most popular hair dye products commonly used by professional hair stylists.  This line is marketed as a breakthrough in hair dye technology which "helps to protect hair from extra damage happening in the presence of metals wherever color is placed."[9] The *Illumina Color* product line is heavily advertised in salons and professional hairdressing communities as a gentler alternative to other hair dyes.

25.   Despite its "breakthrough" formulas and Wella's misleading assurances of safety, Wella has never disclosed or warned professionals that its *Koleston Perfect*, *Color Sensations*, *Illumina Color*, and other professional hair dye products still contain aromatic amines and other carcinogenic properties, and nowhere in the marketing for these products does Wella warn of the increased risk of bladder cancer associated with occupational exposure.

26.   Even Wella's *Color Fresh CREATE* product line— marketed as a "ammonia-free, fragrance-free, and peroxide-free formula"—still contains carcinogens.[10]

---

[7]   WELLA STORE, *Koleston Perfect 7/0 Medium Blonde/ Natural Permanent*, https://us.wella.professionalstore.com/en-US/product/koleston-perfect-7-0-medium-blonde-natural-permanent/000000099350121004 (last visited May 18, 2026).

[8]   WELLA PROFESSIONALS, *Over 140 Years of Passion: Our History*, https://www.wella.com/professional/en-AU/about-the-brand (last visited May 18, 2026).

[9]   WELLA PROFESSIONALS, *Illumina Color*, https://www.wella.com/professional/en-US/illumina-color (last visited May 18, 2026).

[10]   WELLA PROFESSIONALS, *Color Fresh Create: Semi-permanent, expressive color palette*, https://www.wella.com/professional/en-US/color-fresh-create (last visited May 18, 2026).

### 2. L'Oréal

27. In 1978, L'Oréal[11] launched *Majirel*, "the first-ever protective color" product it designed exclusively for application by professional stylists in salon settings.[12] The *Majirel* hair dye line allowed L'Oréal to permeate the salon industry, offering a "hair color protected and enhanced" permanent hair dye that disguised the products' harsh chemical processes behind promises of nourishment.[13]

28. L'Oréal later introduced *iNOA* in 2009, touting its "first-ever ammonia free" permanent hair color product.[14]

29. L'Oréal heavily emphasizes their dedication to the safety of stylists, stating "[s]ince our invention of hair color more than 110 years ago, L'Oréal professional has supported professional talent through our obsession with innovation, tech and *safety* for stylists and women."[15]

30. L'Oréal anchors their history in the aim to free women from the "unpredictable and sometimes dangerous" methods women once used to cover white or gray hair, by marketing invention of a "harmless hair color dyeing process" that "[a]t last, [gave] women [] a safe product to hide their white or gray hair."[16]

31. In recent years, L'Oréal has continued its calculated approach. By launching "natural" options like *Botanea*,[17] the company sought to lure in more health-conscious consumers, still while failing to provide notice of the increased risk of bladder cancer to occupational users of hair dyes.

---

[11] "L'Oréal" as used herein, refers to Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., and L'Oréal S.A.

[12] L'Oréal Professional Paris, *L'Oréal Professional Heritage Book*, (2022), https://www.lorealprofessionnel.in/-/media/project/loreal/brand-sites/lp/apac/in/patrimoine-book/landing-page/loreal_professionnel_heritage_book.pdf?

[13] *Id.*

[14] *Id.*

[15] *Id.* (emphasis added).

[16] *Id.*

[17] Glamot.com, *L'Oréal Professionnel Botanēa*, https://www.glamot.com/b/196713/l-oreal-professionnel-botanea? (last visited May 18, 2026).

32.     To this day L'Oréal's marketing gives misleading assurances of safety and fails to warn stylists and consumers that their professional hair dye products contain dangerous carcinogens known to increase the risk of bladder cancer.

## C.     Defendants designed and made their hair dyes using ingredients which they knew were carcinogenic.

33.     The defendants' hair dye products are carcinogenic, and include carcinogens such as aromatic amines, especially 4-aminobiphenyl (4-ABP),[18] and others such as benzidine, 2-naphthylamine, and 4-chloro-o-toluidine.[19]   Several countries banned the use of these carcinogens in hair dyes in the 1970s, but studies since then show that these ingredients still remain in Defendants' hair dyes, especially 4-ABP and other aromatic amines.[20]

34.     Several American and international governmental bodies have identified known and suspected human carcinogens in hair dyes, corroborating a link between hair dyes and bladder cancer.

35.     The World Health Organization's International Agency for Research on Cancer ("IARC") convenes working groups of world-renowned experts on cancer biology, epidemiology, and other relevant sciences to review specific potential carcinogen exposures and risk of developing specific cancers.  IARC has reviewed and published results of its analysis of carcinogens related to hair dye exposure and its constituent chemicals.  It has published papers on carcinogenic effects of hair dyes and occupations with high hair dye exposure in 1971, 1978, 1982, 1987, 1993, 2001, 2010, 2012, and 2020.

---

[18] Turesky, R. J. et al, *Identification of aminobiphenyl derivatives in commercial hair dyes*, 16 CHEMICAL RSCH. TOXICOLIGY 1162–73 (2003).
[19] Harling, M. et al, *Bladder cancer among hairdressers: a meta-analysis*, 67 OCCUPATIONAL ENV'T MED. 351–8 (2010).
[20] Turesky, R. J. et al, *supra* note 18.

36. IARC has classified several hair dye constituents as human carcinogens (Group 1): benzidine, 4-aminobiphenyl (4-ABP), 2-naphthylamine, ortho-Toluidine, and 4,4'-Methylenebis. The IARC also classified 4-Chloro-ortho-Toluidine as "probably carcinogenic to humans" (Group 2A).[21]

37. A 2012 IARC paper which reviewed data from animal exposure studies and human occupational exposure studies found that "[t]here is sufficient evidence in humans for the carcinogenicity of 4-Aminobiphenyl," and concluded that 4-ABP "causes bladder cancer in humans."[22] In that same report, IARC also concluded there is strong evidence indicating 4-ABP is genotoxic, involving metabolic activation, formation of DNA adducts, and induction of mutagenic (causing genetic mutation) and clastogenic (causing chromosome breakage) effects.[23]

38. The U.S. Department of Health and Services' National Toxicology Program ("NTP") has identified o-Toluidine and Coal Tars and Coal-Tar Pitches as "known carcinogens" among hair dyes' ingredients.[24] It also classified other chemicals in the products as "reasonably anticipated to be a human carcinogen." including, 2,4Diaminoanisole Sulfate; 4-Chloro-o-phenylenediamine; 2,4Diaminotoluene; Disperse Blue 1; Benzidine and dyes metabolized to benzidine; Basic Red 9 Monohydrochloride; and 4,4′Oxydianiline.

---

[21] Baan, R. et al, *Carcinogenicity of some aromatic amines, organic dyes, and related exposures*, 9 LANCET ONCOL 322–3 (2008).

[22] *Chemical agents and related occupations*. 100 IARC MONOGR EVAL CARCINOG RISKS HUM, 9–562 (2012).

[23] *Id.*

[24] Nat'l Toxicology Program, U.S. Dep't of Health & Hum. Servs., *Report on Carcinogens: o-Toluidine* (15th ed. 2021), https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/toluidine.pdf; Nat'l Toxicology Program, U.S. Dep't of Health & Hum. Servs., *Report on Carcinogens: Coal Tars and Cola-Tar Pitches* (15th ed. 2021), https://ntp.niehs.nih.gov/sites/default/files/ntp/roc/content/profiles/coaltars.pdf.

39.     The FDA acknowledges that two carcinogens are commonly contained in hair dyes: 4-methoxy-m-phenylenediamine 2,4-diaminoanisole and 2, 4-methoxy-m-phenylenediamine sulfate 2,4-diaminoanisole sulfate.[25]

40.     The National Cancer Institute of the National Institutes of Health ("NIH") associates hair dye exposure with an increased risk of developing bladder cancer.[26]

41.     The American Cancer Society notes that hairstylists have an increased risk for bladder cancer, and states this is "probably because of heavy exposure to hair dyes."[27]  Relying on other organizations' analysis, the American Cancer Society lists several ingredients from hair dyes as known human carcinogens (i.e., IARC Group 1), including: 4-aminobiphenyl (4-ABP); benzidine; and ortho-toluidine.  The American Cancer Society also lists the following ingredients of hair dye as probable human carcinogens (i.e., IARC Group 2A): aniline and aniline hydrochloride; 4-chloro-ortho-toluidine.

42.     There are several plausible and generally accepted biological mechanisms that could explain associations between occupational exposure to hair dye products and an increased risk of bladder cancer.  For example, a 1975 study by the University of California, Berkley, found that multiple constituents in hair dyes were mutagenic.[28]

43.     Highly relevant to bladder cancer is the discovery that paraphenylenediamine ("PPD"), one of most common aromatic amines used in

---

[25]     *Hair Dyes*, U.S. FOOD & DRUG ADMIN. (Sept. 25, 2025), https://www.fda.gov/cosmetics/cosmetic-products/hair-dyes.

[26] *Hair Dyes, Other Hair Products, and Cancer Risk*, NAT'L CANCER INST. (Dec. 1, 2022), https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/hair-dyes-fact-sheet.

[27]     *Bladder Cancer Risk Factors*, AM. CANCER SOC'Y, https://www.cancer.org/cancer/types/bladder-cancer/causes-risks-prevention/risk-factors.html (last visited June 5, 2026).

[28] *See* Bruce N. Ames et al., *Hair Dyes are Mutagenic: Identification of a Variety of Mutagenic Ingredients*, 72 PROC. NAT'L ACAD. SCI. 2423 (1975), https://doi.org/10.1073/pnas.72.6.2423.

Defendants' hair dyes, is genotoxic to uroepithelial cells, which line the inside of the bladder and form the majority of bladder cancers.[29]

44.    The presence and number of DNA adducts are considered a direct measure of how much a carcinogen has bound to a cell's DNA, which can induce mutagenesis.  Lactating women who use hair dye were eight times more likely to have 4-ABP-DNA adducts in breast epithelium excreted in milk compared to non-hair-dye users.  Among women who had used hair dye more than once in the past 6 months, the risk of having 4-ABP DNA adducts increased by 11 times.  Risk was increased similarly for temporary and permanent hair dye.[30]

45.    Defendants were aware or should have been aware of the increased risk of developing bladder cancer from the occupational use of their hair dye products based on their access to these and other scientific studies, ongoing research, and various government standards and regulations.

**D.    Multiple reliable peer-reviewed studies confirm frequent and long-term exposure to the Defendants' hair dye products causes bladder cancer.**

46.    Dozens of scientific studies in the United States and abroad, conducted over many decades, have consistently shown an increased risk of bladder cancer from occupational exposure to hair dye products.

47.    The risk of developing bladder cancer from hair dyes is particularly significant for hairstylists like Plaintiff because of his frequent exposure to hair dyes in his everyday employment.  Hairstylists' exposure to the carcinogenic chemicals

---

[29] Huang, Y. C. et al (2007). *p-Phenylenediamine induced DNA damage in SV-40 immortalized human uroepithelial cells and expression of mutant p53 and COX-2 proteins*, 170(2) TOXICOLOGY LETTERS 116–123.

[30] Christine B. Ambrosone et al., *Hair Dye Use, Meat Intake, and Tobacco Exposure and Presence of Carcinogen-DNA Adducts in Exfoliated Breast Ductal Epithelial Cells*, 464 ARCH. BIOCHEM. BIOPHYS. 169 (2007).

in Defendants' hair dyes is far greater than those who use and apply hair dyes at home.

48. Several studies have analyzed the risk of bladder cancer among hairstylists. These studies consistently show ***working as a hairstylist increases the risk of bladder cancer by 30% or more***. Moreover, the most recent global meta-analysis of occupational risk and bladder cancer also found that the risk of bladder cancer ***mortality*** was 16% higher among hairstylists.

49. Two meta-analyses (which aggregate the results of many individual studies) specifically focus on the risk of bladder cancer among hairstylists. A 2010 meta-analysis by Harling *et al.*, aggregated the findings of 42 other studies on this topic, each of which involved hairstylists with clinically confirmed bladder cancer.[31] This analysis found that overall, ***hair stylists are 34% more likely to develop bladder cancer as a result of occupational exposure to hair dyes***.

50. Among the studies evaluated by Harling *et al.*, that focused on long-term exposure, three looked at people who worked as a hairstylist for five years or longer. ***The relative risk of bladder cancer in that group was 52% greater***.

51. Together, the studies analyzed by Harling *et al.* ranged from the 1970s, to the 1990s and beyond, suggesting any changes in hair dye formulation over time have not sufficiently reduced carcinogen exposure for hairstylists.

52. Harling *et al.* also found consistent increases in risk across broad geographic areas in the United States and Canada. The relative risk of bladder cancer was almost identical between the studies that adjusted for smoking and those that did not.

53. Another meta-analysis—published in the *International Journal of Epidemiology* in 2009 by Takkouche *et al.*—aggregated the results of 34 studies on

---

[31] Harling et al., *supra* note 19.

cancer risk among hairstylists from 1966 to 2009.[32] Across the studies, the relative risk of bladder cancer in hairstylists and related occupations was 36% higher. ***For the subset of studies that looked at mortality from bladder cancer, the relative risk was 53% greater.*** In the four studies that focused on people with more than 10 years of hairdressing experience (versus no hairdressing), the risk for bladder cancer ***almost doubled*** (93% greater). The report found no substantial difference in relative risk by time period, whether the studies were performed in the 1970s or later.

54. Other meta-analyses have evaluated the risk of bladder cancer across many professions, including hairstylists. First, a 2015 global meta-analysis by Cumberbatch *et al.* in *JAMA Oncology* found not only did the risk of bladder cancer increase by 32% among hairstylists, but also the risk of *mortality* from bladder cancer increased by 16%.[33] It also found the risk of bladder cancer was highest among occupations in which employees were routinely exposed to aromatic amines, specifically listing hairstylists as one of the occupations at issue.

55. The Cumberbatch *et al.* study found the main carcinogen for hairstylists is 4-aminobiphenyl (4-ABP), which IARC has designated as carcinogenic to humans (*i.e.*, a Group 1 carcinogen). Although the chemical has been restricted since the 1970s, a 2003 study by Turesky *et al.* found 4-ABP was present in eight out of eleven hair dyes they purchased and tested the year purchased.[34]

56. A 2008 meta-analysis of bladder cancer across occupations by Reulen *et al.* looked at 29 individual studies and found the relative risk of bladder cancer among hairstylists was 23% greater. The authors identified hairstylists' frequent

---

[32] Bahi Takkouche et al., *Risk of Cancer Among Hairdressers and Related Workers: A Meta-Analysis*, 38 INT'L J. EPIDEMIOLOGY 1512 (2009), https://doi.org/10.1093/ije/dyp283.

[33] Marcus G. K. Cumberbatch et al., *Contemporary Occupational Carcinogenic Exposure and Bladder Cancer: A Systematic Review and Meta-Analysis*, 1 JAMA ONCOLOGY 1382 (2015), https://doi.org/10.1001/jamaoncol.2015.3209.

[34] Turesky, R. J. et al, *supra* note 18.

exposure to hair dyes as the likely culprit of the increased risk, explaining hair dyes "may contain arylamines, which may be absorbed via the skin or inhaled by the lungs," and that "[o]nce processed in the body, concentrated amounts of arylamines may be found in the bladder, inducing carcinogenic processes and eventually leading to the development of bladder tumours."[35]

57. A 2003 meta-analysis looked at 11 studies of bladder cancer in men in Western Europe between 1976 and 1997, which were based on more than 3,000 cases. The study investigated associations with occupational exposures. Among people who worked for more than 25 years as a hairstylist, the study found a 60% increase in the risk of bladder cancer.[36]

58. Many other studies have also found an increased risk of bladder cancer among hairstylists. For example, a 2015 study of 15 million individuals in Northern Europe, which investigated links between occupational history and cancer risk, found professional hair coloring was associated with the second-highest risk level for bladder cancer.[37] A nationwide study in New Zealand in 2008 found *hairstylists were over nine times more likely to develop bladder cancer*.[38] A 2005 study of occupation and bladder cancer in Sweden found a 26% increased risk of bladder cancer among hairstylists.[39] A 2001 publication studying a Los Angeles population of 1,500 cases found those who had ever been employed as a hairstylist or barber

---

[35] Raoul C. Reulen et al., *A Meta-Analysis on the Association Between Bladder Cancer and Occupation*, 42 SCANDINAVIAN J. OF UROLOGY & NEPHROLOGY 74 (2010), https://doi.org/10.1080/03008880802325192.

[36] Manolis Kogevinas et al., *Occupation and Bladder Cancer Among Men in Western Europe*, 14 CANCER CAUSES & CONTROL 907 (2003), https://doi.org/10.1023/b:caco.0000007962.19066.9c.

[37] Eero Pukkala et al., *Occupation and Cancer—Follow-up of 15 Million People in Five Nordic Countries*, 48 ACTA ONCOLOGICA 646 (2009), https://doi.org/10.1080/02841860902913546.

[38] Evan Dryson et al., *Case-Control Study of High Risk Occupations for Bladder Cancer in New Zealand*, 122 INT'L J. CANCER 1340 (2008), https://doi.org/10.1002/ijc.23194.

[39] Jianguang Ji et al., *Occupation and Bladder Cancer: A Cohort Study in Sweden*, 92 BRITISH J. CANCER 1276 (2005), https://doi.org/10.1038/sj.bjc.6602473.

were at a 50% increased risk of bladder cancer—but for the people who had worked as a hairstylist or barber for over 10 years, ***the relative risk became 510% greater***.[40]

E.     **The Defendants' hair dyes were subject to federal safety and labeling requirements.**

59.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce. *Id.* §§ 361–362. Adulteration refers to a violation involving product composition, whether the adulteration results from ingredients, contaminants, processing, packaging, shipping, or handling. *Id.* § 361. Under the FDCA, a cosmetic is adulterated if it contains any poisonous or deleterious substance causing injury to the product user, or if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health. *Id.* Misbranding refers to violations involving improperly labeled or deceptively packaged products. *Id.* § 362.

60.     Under the Fair Packaging and Labeling Act, 15 U.S.C. § 1451 *et seq.* ("FPLA"), a cosmetic is misbranded if: (1) its labeling is false or misleading, (2) the label does not include all required information, (3) required information is not prominent and conspicuous, or (4) the packaging and labeling violates an applicable regulation issued pursuant to Sections 3 and 4 of the Poison Prevention Packaging Act of 1970.

61.     Under federal law, cosmetics manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[41] An example of

---

[40] Manuela Gago-Dominguez et al., *Permanent Hair Dyes and Bladder Cancer: Risk Modification by Cytochrome P4501A2 and N-acetyltransferases 1 and 2*, 24 CARCINOGENESIS 483 (2003), https://doi.org/10.1093/carcin/24.3.483.

[41] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration (Feb. 25, 2022), https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics.

such an ingredient is methylene chloride because it causes cancer in animals and is likely harmful to humans.  21 C.F.R. § 700.19.

62.    Companies and individuals who manufacture and/or market cosmetics have a legal responsibility and duty to ensure the safety of their products.  The FDA has consistently advised cosmetics manufacturers to use whatever testing is necessary to ensure the safety of their products and ingredients, which may be determined through: (a) reliance on already available toxicological test data on individual ingredients and product formulations that are similar in composition to the cosmetic at issue, and (b) performing any additional toxicological tests or other tests that are appropriate in light of such existing data and information.[42]

63.    Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that: (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.

64.    Whether the product is properly labeled, 21 CFR § 740.1 defines the warning statements required for cosmetic products.  Section 740.1 states, "[t]he label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the product" (emphasis added).  This duty to warn corresponds to the broad responsibility of manufacturers to ensure their cosmetic products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

---

[42] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration (Mar. 3, 2005), https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated.

65. When a manufacturer is unable to adequately substantiate the safety of their product before marketing it, the product is misbranded if the principal display panel does not include the following "conspicuous statement" from 21 CFR § 740.10: "*Warning* – The safety of this product has not been determined."

66. The current regulatory framework requires Defendants to assess the safety of their hair dye products and warn users, including professional hairstylists, of any and all health hazards.

67. Further, Defendants had the capacity to design hair dye products that were safer than the Products they manufactured, marketed, and sold. The alternative Product designs Defendants could have used would not have changed the intended purpose of the Products. Such alternative safer designs include, but are not limited to, replacing toxic chemicals with readily available natural ingredients.

**F.   Mr. Shaffer developed bladder cancer from his exposure to Defendants' hair dyes, forcing him to undergo painful, stressful, and expensive treatment and monitoring.**

68. Mr. Shaffer used and applied professional hair dyes manufactured by Wella International Operations Switzerland S.A.R.L, Wella Operations US LLC d/b/a The Wella Company, L'Oréal USA, Inc., L'Oréal USA Products, Inc., and L'Oréal S.A. at various points while working as a professional hair stylist from 1994 to 2023.

69. For each hair dye used, Mr. Shaffer mixed and applied the product in accordance with the instructions provided on the product's label or contained within its packaging.

70. None of the Defendants' hair dyes Mr. Shaffer used and applied contained any warning that long-term occupational exposure to Defendants' products could cause bladder cancer or increase the risk of developing bladder cancer.

71.   Mr. Shaffer was diagnosed with bladder cancer in 2023.  He was fifty-six years old at the time of his diagnosis.

72.   Mr. Shaffer suffered significant pain and mental distress from the chemotherapy treatment he underwent to try and treat his cancer.  He's had surgery to attempt to remove the cancer, which was incredibly painful and expensive.  The recovery process has been long and filled with nausea, pain, and depression.

73.   Mr. Shaffer has suffered injuries, including his bladder cancer and the resulting necessary treatments, which were directly and proximately caused by his exposure to and use of Defendants' hair dyes.

74.   Mr. Shaffer has also suffered pain and severe emotional distress as a result of his bladder cancer, related treatments, and related health problems.

75.   Mr. Shaffer did not know and could not know that his occupational exposure to Defendants' hair dye products could cause his bladder cancer.

76.   Additionally, the running of any statute of limitations has been equitably tolled by reason of Defendants' conduct.  Through their affirmative misrepresentations and omissions, Defendants actively concealed from Mr. Shaffer the true risks associated with the exposure to the hair dye products.

77.   As a result of Defendants' actions, Mr. Shaffer was unaware, and could not reasonably know, or could not have reasonably learned through reasonable diligence, that he had been exposed to the risks alleged.

78.   As a result of Defendants' acts and/or omissions, Mr. Shaffer has suffered and will continue to suffer bladder cancer and other physical injuries, medical and hospital costs, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Mr. Shaffer is entitled to recover.

## V.     CAUSES OF ACTION

## COUNT I – Negligent Failure to Warn Pursuant to N.C. Gen. Stat. § 99B-5
### *Against All Defendants*

79.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 to 78 as if fully restated herein.

80.     At all pertinent times, Defendants manufactured, marketed, promoted, sold, and/or distributed their hair dye products in the regular course of business.

81.     Defendants designed their hair dye products to be used and applied by professional hair stylists such as Plaintiff.  Defendants knew then, and still know now, that these stylists generally use and apply hair dyes on a daily basis, multiple times per day, and therefore it was foreseeable that Plaintiff would do so.

82.     Plaintiff did in fact use and apply Defendants' hair dye products apply by hand to his clients' hair on a daily basis, multiple times per day, over the course of his multi-decade career as a professional hair stylist.

83.     Defendants owed a duty to Plaintiff, as a professional hair stylist and foreseeable user of their products, to warn him that occupational exposure to Defendants' hair dye products significantly increases his risk of bladder cancer.

84.     Defendants' hair dye products reached Plaintiff without any substantial changes to the condition in which they were manufactured, sold, or otherwise released into the stream of commerce by Defendants.

85.     Defendants breached their duty to Plaintiff because they knew or should have known that the occupational use of their hair dye products—by professional hair stylists, in particular—significantly increases the risk of developing severe and/or life-threatening health conditions, specifically bladder cancer.  Defendants knew or should have known that this risk exists even when their products are used (or misused) in the manner intended, or reasonably foreseeable to, Defendants.

86.     Such risks were known and/or knowable to Defendants at all pertinent times, especially, but not solely because of, the scientific, peer-reviewed academic literature available at the time Defendants designed, manufactured, marketed, and sold their hair dye products.

87.     Defendants knew or should have known that the ordinary consumers/users of their hair dye products, especially professional stylists such as Plaintiff, would not have (and did not) recognize or discover the increased risk of bladder cancer caused by the occupational use of Defendants' hair dye products.

88.     Despite their knowledge of the risks, Defendants failed to warn Plaintiff—through their products' labeling, packaging, instructions, marketing, advertising, or any other mode of communication—that frequent, daily, continuous, and/or long-term exposure to their hair dye products, especially by professional hair stylists, could cause or greatly increase the risk of bladder cancer.

89.     As a direct and proximate result of Defendants' failure to warn, Plaintiff has suffered and will continue to suffer bladder cancer and other physical injuries, medical and hospital costs, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Plaintiff is entitled to recover.  Defendants' failure to warn Plaintiff was a substantial factor in causing each of the damages outlined herein.

90.     Plaintiff's cancer and resulting injuries are a "disease" under North Carolina law and are thus not subject to the North Carolina Statute of Repose.

91.     As a result of Defendants' lack of adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, Defendants are liable for damages to Plaintiff.

## COUNT II – Design Defect Pursuant to N.C. Gen. Stat. § 99B-6
### *Against All Defendants*

92. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 to 91 as if fully restated herein.

93. At all relevant times, Defendants designed, developed, manufactured, marketed, sold, and distributed their hair dye products in a defective and unreasonably dangerous condition.

94. Defendants placed their hair dye products into the stream of commerce to be sold, used, and applied at professional hair salons by professional hair stylists.

95. Defendants' hair dye products were expected to (and did) reach professional hair stylists, including Plaintiff, without any change in the condition in which they were manufactured and sold by Defendants and/or otherwise released into the stream of commerce.

96. In each instance, Plaintiff used and applied Defendants' hair dye products in a manner intended, recommended, promoted, marketed, and reasonably foreseeable by Defendants.

97. Defendants owed a duty to Plaintiff and all other reasonably foreseeable users to design their products to be safe for ordinary use.

98. Defendants acted unreasonably and breached their duty because they knew, or by the exercise of reasonable care should have known, that their hair dye products were and are unreasonably dangerous because of their carcinogenic nature. Nonetheless, Defendants designed, manufactured, sold, distributed, marketed, promoted, and supplied their products to professional hair salons and stylists, including Plaintiff.

99. Defendants could have manufactured and designed their products in safer, alternative ways. For example, Defendants did not and do not have to use known and/or probable carcinogens in the design and manufacturing of their hair

dye products. They could have designed and manufactured their products without such ingredients, but they chose not to.

100. Use of known and/or probable carcinogens in the design and manufacturing and Defendants' hair dyes is not an inherent characteristic of hair dye that removal would have substantially compromised Defendants' hair dye usefulness or desired outcomes by professional hair salons and stylists.

101. Defendants' hair dye products failed to perform safely even though Plaintiff used and applied Defendants' hair dye products in a manner intended, recommended, promoted, marketed, and reasonably foreseeable by Defendants.

102. The increased risk of bladder cancer caused by occupational exposure to Defendants' hair dyes, even when used as instructed and/or intended, renders the products unreasonably dangerous to an extent beyond what would have been contemplated by an ordinary, reasonable user—especially professional stylists such as Plaintiff.

103. The increased risk of bladder cancer caused by occupational exposure to Defendants' hair dyes from their use of known and/or probable carcinogens in the design and manufacturing make Defendants' hair dyes so unreasonably dangerous that no reasonable person, or Plaintiff, would have used such hair dyes if made previously aware of the increased risk.

104. Any benefits of Defendants' hair dye products as they were designed and manufactured were and continue to be substantially outweighed by the significant health risks inherent in the way that Defendants designed and manufactured the products at the pertinent times.

105. Defendants' hair dye products are inessential cosmetic products that do not treat or cure any serious disease.

106. As a direct and proximate result of Defendants' defective design and/or manufacturing of their hair dye products, Plaintiff suffered and will continue to

suffer bladder cancer and other physical injuries, medical and hospital costs, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Plaintiff is entitled to recover.

107. Defendants' defective design and manufacture of their products was a substantial factor in causing Plaintiff's harm.

108. As a result of Defendants' manufacture, sale, and/or distribution of defective products, Defendants are liable in damages to Plaintiff.

## COUNT III – Violation of Chapter 75 – Unfair and Deceptive Trade Practices
### *Against All Defendants*

109. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 to 108 as if fully restated herein.

110. At all pertinent times, Defendants manufactured, marketed, promoted, sold, and/or distributed their hair dye products in the regular course of business.

111. Defendants designed their hair dye products to be used and applied by professional hair stylists such as Plaintiff. Defendants knew then, and still know now, that these stylists generally use and apply hair dyes on a daily basis, multiple times per day, and therefore it was foreseeable that Plaintiff would do so.

112. Plaintiff did in fact use and apply Defendants' hair dye products apply by hand to his clients' hair on a daily basis, multiple times per day, over the course of his multi-decade career as a professional hair stylist.

113. Plaintiff used and applied Defendants' hair dye products in a manner intended and/or foreseeable by Defendants, and in accordance with all instructions provided to him by Defendants.

114. Defendants' hair dye products reached Plaintiff without any substantial changes to the condition in which they were manufactured, sold, or otherwise released into the stream of commerce by Defendants.

115. At all pertinent times, Defendants knew or should have known that the occupational use of their hair dye products—by professional hair stylists, in particular—significantly increases the risk of developing severe and/or life-threatening health conditions, specifically bladder cancer. Defendants knew or should have known that this risk exists even when their products are used (or misused) in the manner intended, or reasonably foreseeable to, Defendants.

116. Such risks were known and/or knowable to Defendants at all pertinent times, especially, but not solely because of, the scientific, peer-reviewed academic literature available at the time Defendants designed, manufactured, marketed, and sold their hair dye products.

117. Despite their knowledge of the risks, Defendants failed to warn Plaintiff—through their products' labeling, packaging, instructions, marketing, advertising, or any other mode of communication—that frequent, daily, continuous, and/or long-term exposure to their hair dye products, especially by professional hair stylists, could cause or greatly increase the risk of bladder cancer.

118. As set forth herein, Defendants acted in a manner which had the capacity or tendency to deceive and acted unfairly by failing to disclose and/or warn professional salons and stylists of the increased risk of developing severe and/or life-threatening health conditions, specifically bladder cancer, through the occupational use of their hair dye products.

119. Defendants' acts, as set forth herein, were acts in or affecting commerce and constitute unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 *et seq.*

120. As a direct and proximate result of Defendants' failure to warn, Plaintiff has suffered and will continue to suffer bladder cancer and other physical injuries, medical and hospital costs, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Plaintiff is entitled to recover. Defendants' failure to warn Plaintiff was a substantial factor in causing each of the damages outlined herein.

121. As a result of Defendants' lack of adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, Defendants are liable for damages to Plaintiff.

## VI.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiff hereby demands a trial by jury on all triable issues within this action.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and causes of action, and as follows:

(a)   Awarding past and future non-economic compensatory damages including, but not limited to, physical injury, loss of bodily function, pain, suffering, discomfort, fright, nervousness, anxiety, worry, apprehension, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

(b)   Awarding past and future economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings, opportunity costs, and other economic damages in an amount to be determined at trial of this action;

(c)     Awarding damages and/or equitable relief to provide medical monitoring for the early detection, diagnosis, and treatment of injuries related to the Products and prevention of exacerbation of such injuries;

(d)     Awarding punitive and/or exemplary damages for Defendants' wanton, willful, fraudulent, reckless acts which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public, and to Plaintiff, in an amount sufficient to punish Defendants and deter future misconduct;

(e)     Statutory damages;

(f)     Prejudgment interest;

(g)     Post-judgment interest;

(h)     Plaintiff's reasonable attorneys' fees and costs;

(i)     The costs of these proceedings; *and*

(j)     Such other and further relief as this Court deems just and proper.

DATED:  July 27, 2026

*/s/ Gary K. Shipman*
Gary K. Shipman
N.C. Bar No. 9464
SHIPMAN WRIGHT & MOORE LLP
575 Military Cutoff Raod Suite 106
Wilmington, North Carolina 28405
Tel.: (910) 762-1990
gshipman@shipmanlaw.com

Diandra S. Debrosse*
DICELLO LEVITT LLP
485 Lexington Ave Suite 1001
New York, New York 10017
Tel.: (646) 933-1000
fu@dicellolevitt.com

27

Eli J. Hare*
Elton H. Darby III*
DiCELLO LEVITT LLP
505 20th Street S, Suite 1500
Birmingham, Alabama 35203
Tel.: (205) 855-5700
ehare@dicellolevitt.com
edarby@dicellolevitt.com

Mark Abramowitz*
DiCELLO LEVITT LLP
8160 Norton Parkway, 3rd Floor
Mentor, Ohio 44030
Tel.: (440) 953-8888
mabramowitz@dicellolevitt.com

*Counsel for Plaintiff*

**Pro hac vice* application forthcoming